IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-CV-01189-NYW

CIBER, INC.,

        Plaintiff,

    v.

ACE AMERICAN INSURANCE COMPANY,

        Defendant.

---

## AMENDED COMPLAINT AND JURY DEMAND

---

Plaintiff Ciber, Inc. ("Ciber"), by and through its counsel states as follows:

### PARTIES

1.    Ciber is a Delaware Corporation with its principal place of business in in Greenwood Village, Colorado.  Pursuant to 28 U.S.C. § 1332 (c)(1), Ciber is a resident of Delaware and Colorado.

2.    Defendant ACE American Insurance Company ("ACE") offers insurance policies throughout the United States, including Colorado, and upon information and belief is a corporation organized and existing under the laws of the State of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania.  Pursuant to 28 U.S.C. § 1332 (c)(1), ACE is a resident of Pennsylvania.

### JURISDICTION AND VENUE

3.    There is complete diversity between the Plaintiff and Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.  As discussed in more detail

below, the damages asserted are based on the cost of defense, the cost of indemnity, and bad faith.

4.       This Court has jurisdiction over this action pursuant to diversity of citizenship jurisdiction under 28 U.S.C. §1332.

5.       Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because ACE conducts business in, and may be found in, this district, Ciber purchased the subject Policy, as defined below, in this district, and a substantial part of the events or omission giving rise to this lawsuit occurred in this district.

## GENERAL ALLEGATIONS

6.       Ciber incorporates by reference each and every allegation contained in paragraphs 1 through 5 of this Amended Complaint.

7.       This is an action for declaratory judgment, breach of contract, breach of the duty of good faith and fair dealing, and punitive damages.

## THE POLICY

8.       Ciber purchased from ACE an Advantage Digital and Technology Professional Liability Insurance Policy, No. EON G21675258 005 ("Policy"), with a policy period of July 1, 2009 to July 1, 2010.

9.       The Policy provides to Ciber $20 million in coverage for each claim and in the aggregate.

10.      The Policy's Endorsement No. 6 provides for a $500,000 retention.

11.      ACE has a duty to defend Ciber from any claims or lawsuits that potentially fall within the Policy's coverage.

53302520.3

12.     The Policy's Insuring Agreement A provides coverage for "a Claim first made against the Insured during the Policy Period [for] any error, misstatement, misleading statement, act, omission, neglect, breach of duty, or Personal Injury offense actually or allegedly committed [in] the Insured's rendering or failure to render Technology Services to others for a fee."

13.     The Policy's Insuring Agreement B provides coverage where "in the course of the provision of Electronic Media Activities, a [Wrongful Act] gives rise to [Claims of]:

      a.      Plagiarism, piracy (excluding patent infringement), or the misappropriation or unauthorized use of advertising ideas, advertising materials, titles, literary or artistic formats, styles or performances;

      b.      The infringement of copyright, domain name, trademark, trade name, trade dress, title or slogan, service mark, or service name; or

      c.      Negligence with respect to the Insured's creation or dissemination of Electronic Content."

14.     The Policy defines "Wrongful Act" as "any error, misstatement, misleading statement, act, omission, neglect, breach of duty, or Personal Injury offense actually or allegedly committed or attempted by any Insured."

15.     The Policy defines "Electronic Media Activities" as "the electronic publishing, dissemination, releasing, gathering, transmission, production, webcasting, or other distribution of Electronic Content on the Internet on behalf of the Insured or by the Insured for others."

16.     The Policy defines "Electronic Content" as "any data, text, sounds, images or similar matter disseminated electronically."

17. The Policy defines "Internet" to include "intranets, extranets, and virtual private networks."

## THE UNDERLYING CAMSOFT ACTION

18. On October 23, 2009, Ciber was named as a defendant in an action styled as *CamSoft Data Systems, Inc. v. Southern Electronics Supply, Inc. et al*, filed in the Baton Rouge Parish Civil District, 19th Judicial District, State of Louisiana, Case No. 582,741 (the "CamSoft Action").

19. The CamSoft Action alleged that in the early 2000s several entities were involved in developing and marketing to the City of New Orleans a wireless video surveillance system.

20. Prior to anyone fully developing the wireless video surveillance system, CamSoft had allegedly developed and provided to the City of New Orleans the virtual private network that would later be used for the wireless video surveillance system.

21. CamSoft claimed to have "invented" and "developed" the disputed system.

22. Several entities eventually signed a contract with the City of New Orleans to install several cameras throughout New Orleans.

23. CamSoft alleged that it was left out of those contracts and did not receive any proceeds from the contracts for installation and maintenance of the surveillance cameras.

24. The CamSoft complaint alleged that Ciber entered into several contracts to perform technology services for the wireless video surveillance system, and alleged Ciber's liability related to its performance of those technology services.

25. CamSoft alleged causes of action against Ciber for: (1) violation of the Sherman Act; (2) violation of Robinson-Patman; (3) RICO; (4) state antitrust law; (5) violation of

Louisiana's Unfair Trade Practices Act (LUPTA); (6) violation of Louisiana's Uniform Trade Secrets Act (LUTSA); (7) fraud; (8) unjust enrichment; and (9) conspiracy.

26.    Defendants removed the CamSoft Action to federal court.

27.    Although the federal court eventually dismissed all of CamSoft's causes of action, the Fifth Circuit concluded on appeal that the federal courts did not have jurisdiction in the first place because there was no patent.

28.    The Fifth Circuit's October 9, 2014, ruling nullified all prior state rulings and proceedings and placed the case back into its initial stages.

29.    Following remand, on February 10, 2015, CamSoft filed its Master Petition in the CamSoft Action on February 10, 2015, with the following alleged causes of action against Ciber: (1) conspiracy to commit intentional torts, including (a) fraud; (b) tortious interference with contract; and (c) conversion of CamSoft's confidential business information; (2) conspiracy to violate LUTSA; (3) conspiracy to violate Louisiana's Antitrust Act; and (4) conspiracy to violate LUTPA.

30.    The Master Petition alleges that the action "stems from the conversion and misappropriation of CamSoft Data Systems, Inc.'s confidential and proprietary technical and business information" involving "transmitting live video signals over wireless networks."

31.    The CamSoft Master Petition makes numerous references to "marketing," including allegations that:

    a.    "The conspirators desired to independently market and sell their replica surveillance system;"

    b.    The defendants entered into "lucrative marketing agreements with billion

53302520.3

dollar technology vendors, including Dell, Inc., and Ciber, Inc.;"

c.       The defendants entered into an agreement to "market and sell the Crime Camera System nationally and internationally;"

d.       The defendants were "independently marketing themselves . . . as the New Orleans Crime Camera System integrators and installers;"

e.       The defendants "similarly marketed themselves as such to state officials;"

f.       The defendants "used their relationship with Ciber, Inc., to market CamSoft's Crime Camera System;"

g.       "Ciber deployed the Crime Camera System using the very same confidential information it obtained" from CamSoft; and

h.       The defendants converted "CamSoft's confidential business information, including:  device compilations, software code, know-how, networking designs, installation processes, business methods, marketing plans, pricing information, and strategic wireless network integrator business plans."

32.    CamSoft's Master Petition involves infringement of "trademark, trade name, trade dress, title or slogan, service mark, or service name," as it repeatedly makes allegations as to "CamSoft's Tropos equipment," the "Crime Camera System," and that "Ciber deployed the Crime Camera System using the very same confidential information it obtained during exposure to CamSoft's information."

33.    CamSoft's Master Petition alleges negligence in the dissemination of Electronic Content, as the Crime Camera System involves the dissemination of video and audio to police officers in the subject area.

34.     In its Master Petition, CamSoft seeks damages against Ciber for the loss of its financial investments, profits, price erosion, and royalties.  CamSoft seeks lost proceeds related to technology contracts, ongoing maintenance contracts, and service provider contracts.  It seeks damages for its alleged loss of market share, loss of business reputation, and damages for the asserted unjust use of its confidential information, trade secrets, and research and development technologies.  It also requests treble damages.

35.     The Master Petition contains several allegations related to the amount of damages CamSoft seeks in the lawsuit against Ciber and the alleged value of lost business opportunities. The Master Petition asserts that the confidential and proprietary surveillance system "was worth hundreds of millions, if not billions of dollars, in future government and private security sales." The Master Petition also alleges that Ciber and others have already "obtained over $4 million in replica system sales from the City of Baton Rouge alone," that Ciber received "over $40 million in technology contract work," and that "Ciber directly profited from this fraud by billing the City of New Orleans for over $900,000 in Crime Camera System sales inside New Orleans alone."

## CIBER'S NOTICE TO ACE

36.     Ciber gave ACE notice of the CamSoft Action within two weeks of being named as a defendant.

37.     ACE was forwarded the October 23, 2009, CamSoft complaint on November 6, 2009.

38.     On December 17, 2009, ACE stated that it had "not made any determination as to the validity of the above-referenced matter, nor do we assert that any liability exists; however, ACE does not believe there is coverage for this matter."

39.     ACE further stated that it was "in the process of reviewing the documents provided to us and must necessarily reserve the right to deny coverage based upon grounds other than those expressly set forth in this letter and to supplement and/or amend this letter to address additional coverage issues as they may arise."

40.     ACE also agreed that it would "take into consideration any additional information that [Ciber] provides."

41.     At that time, Ciber had not yet incurred sufficient defense costs to meet the Policy's $500,000 retention, and thus continued to provide its own defense in the CamSoft Action.

## ACE'S BAD FAITH AND DELAY

42.     After CamSoft filed its Master Petition following remand, and Ciber had exhausted the $500,000 retention, CamSoft tendered to ACE its defense and indemnification of the CamSoft Action on October 15, 2015.

43.     Despite Ciber's need for the defense it had purchased in an action alleging millions of dollars in damages, ACE delayed providing Ciber with its response for over three months.

44.     On November 10, 2015, Ciber followed up on a voicemail to ACE and asked that ACE "[p]lease let me know when you expect we will receive a response and whether there is any additional information you need from us."

45.     ACE responded two days later, on November 12, 2015, informing Ciber that it was "discussing internally and finalizing our response," and that "[o]nce the discussions are done, I can give you a better time frame."

53302520.3

46.     ACE did not provide a time frame for its response as promised.

47.     On November 18, 2015, Ciber again asked in an email that ACE "please let me know if those discussions have taken place and when we will have a response."

48.     ACE did not respond to the November 18, 2015 email.

49.     On November 23, 2015, Ciber again asked in an email that ACE "[p]lease let me know when you expect we will receive a response and whether there is any additional information you need from us."

50.     The following day, on November 24, 2015, ACE confirmed that it did "not need additional information at this time," and stated that "[w]e are just revising our response internally currently."

51.     After still not receiving an update, on December 7, 2015, Ciber asked in an email that ACE "please provide us with an eta on Ciber's tender letter."

52.     ACE responded that the representative had "a draft into my manager and am waiting feedback."

53.     In response, Ciber asked that ACE at least give "an estimated date that I can bring back to my client?  Say, December 18th (two weeks)?"

54.     Refusing to even give an estimated date, the ACE representative stated that "[o]nce I hear back from my manager, I can give you a better idea."

55.     ACE did not follow up or provide Ciber with an estimated response date.

56.     On December 16, 2015, Ciber sent an email stating that "[i]t's been over two months now, and I at least need an expected date I can give my client for ACE's response."

53302520.3

57.     Still dragging its feet, ACE responded six days later by stating that "[w]e are still finalizing the response internally.  Once I get a better idea, I will be able to give you a better timeframe."

58.     After a month had passed with no response of any kind from ACE, Ciber sent a letter on January 15, 2016 demanding ACE's response to the tendered defense by no later than January 22, 2016.

59.     Five days later, on January 20, 2016, ACE requested an additional two weeks to provide its response, to which Ciber responded with a deadline of January 27, 2016.

60.     More than three months after Ciber tendered its defense, ACE responded with a letter dated January 27, 2016, that denied coverage and refused to provide a defense.

61.     ACE's January 27, 2016, letter stated that "Chubb North American Claims ('Chubb') is now responsible for handling claims previously handled by ACE."

62.     Despite months of assuring its policyholder that ACE was itself analyzing Ciber's tender letter, the response came from outside counsel that had "been retained on behalf of Chubb."

63.     ACE did not retain outside counsel to protect Ciber's interests in the coverage determination, and instead only retained counsel to look out for ACE's own interests.

64.     In its January 27, 2016, coverage letter, ACE admitted that there was potential coverage under Insuring Agreements A & B, but nevertheless denied coverage based on asserted exclusions.

65.     ACE did not have a reasonable basis for denying coverage and refusing to provide Ciber with a defense.

53302520.3

**ACE'S CONTINUED BAD FAITH AND WAIVER OF THE POLICY'S ALTERNATIVE
DISPUTE RESOLUTION PROVISION**

66.     Having already endured ACE's three and a half month delay at a time when Ciber

needed the security of a defense promised by the Policy, Ciber immediately took steps to resolve

the coverage dispute.

67.     The Policy's Section XX provides for "non-binding Mediation administered by

any Mediation facility to which the Insurer and the Insured mutually agree."

68.     The Policy further provides that "[i]n the event of Mediation, either party shall

have the right to commence a judicial proceeding; provided, however, that no such judicial

proceeding shall be commenced until at least 60 days after the date the Mediation shall be

deemed concluded or terminated."

69.     Recognizing ACE's failure to proceed in good faith, and its repeated efforts at

delaying Ciber's rights under the Policy, Ciber immediately exercised its right to mediation in

order to move forward with eventually filing the current judicial proceeding (assuming ACE

acted with the same bad faith in mediation proceedings).

70.     Accordingly, on February 3, 2016, Ciber notified ACE that "Ciber elects to

resolve this dispute through non-binding mediation in Colorado."

71.     On February 9, 2016, ACE confirmed that it is "amenable to non-binding

mediation in Colorado . . . subject to our mutual agreement as to the mediator."

72.     Ciber immediately left a voicemail with ACE's counsel to discuss details of a

mediator and set a mediation date that would be no later than early March.

73.     On February 17, 2016, Ciber's counsel sent an email stating that "[w]e left you a

message the other day about proceeding with the mediation details.  Can you give us a time that

you're available today or tomorrow for a brief call?"

74.     After receiving no response, Ciber's counsel sent a follow-up email on March 1, 2016, pointing out that "[i]t has been a month now that Ciber opted for its right to mediation under the policy issued by ACE."

75.     Ciber's March 1, 2016, email further pointed out that "[w]e immediately left you a voice message to discuss the logistics and to agree upon a mediator, informing you that we would like to move forward with the mediation as soon as possible."

76.     Ciber's March 1, 2016, email also explained that "[u]nfortunately, ACE's insured faced a similar delay and, despite repeated requests, did not even receive an answer to its tendered defense for over 3 months.  Now we have waited another month just for a conference call to discuss the simple logistics to get the mediation scheduled that Ciber has a right to under the policy.  This trend has to stop.  ACE owes Ciber better than this."

77.     Two days later, on March 3, 2016, ACE's counsel responded that he "should be available most of today.  Please call me at your convenience."

78.     Ciber's counsel called that same day and provided the name of Ed Dauer as the suggested mediator, who had previously conducted mediations involving ACE, and gave dates in March and early April for the proposed mediation.

79.     On March 17, 2016, Ciber's counsel sent ACE's counsel another email, stating that "[a]nother two weeks have passed and we never heard back from you regarding Ed Dauer as mediator and the dates we proposed, despite repeated voicemails we have left during the interim.  Over six weeks have now passed since Ciber opted for its right to mediation under the policy, and Chubb's only effort to comply with that right was to finally have a single telephone

conversation over two weeks ago.  Chubb's good faith duties under the policy require much more than that, including that it not cause unnecessary delay in this process.  As stated previously, Ciber wanted to complete the mediation in March, but agreed to push into the first week of April as an accommodation to Chubb.  Given the lack of feedback, we have confirmed Mr. Dauer as the mediator and have scheduled the mediation for April 5th.  Chubb has utilized Mr. Dauer's services in other mediations, and should have no objections to his appointment as mediator.  In any event, Chubb has had more than ample opportunity to raise any objections and has failed to do so."

80.     Several days later, on March 21, 2016, Ciber's counsel received a telephone call from ACE's counsel to discuss the mediation and Mr. Dauer as mediator.  ACE's counsel asked for Mr. Dauer's information sheet from his website.

81.     On March 23, 2016, Ciber's counsel sent an email to ACE's counsel to provide the information sheet on Mr. Dauer, and to "reiterate that resolving this matter is very important for Ciber, and we do not want ACE to further delay the mediation.  Months have passed since Ciber tendered its defense and it's been over a month since Ciber informed ACE that it would pursue mediation under the policy, but we have not received responses to our repeated requests for mediation dates.  You informed me that April 5th does not work for you, but I do need dates by tomorrow at the latest."

82.     Three weeks later, after once again getting no response from ACE, Ciber's counsel sent an email dated April 13, 2016, stating that "[o]nce again a significant additional period of time has lapsed (3 weeks) and ACE has continued to stall the mediation from going forward.  Ten weeks have passed since Ciber elected for mediation under the policy, and over

53302520.3

those ten weeks ACE has done absolutely nothing to allow the mediation to move forward, despite Ciber making clear we wanted the mediation in March, and then early April at the latest. . . . If we do not receive ACE's position on Mr. Dauer and its available mediation dates by this Friday at the latest, we must simply proceed and treat the policy's dispute resolution provisions as breached by ACE."

83.     On April 15, 2016, ACE's counsel responded that "Chubb's representative is available to mediate this matter on 6/27 or 6/28.  Our client is evaluating Mr. Dauer and also contemplating several other mediators located in Denver that may be of assistance.  We will provide you with a short list of the candidates by next week."

84.     On April 18, 2016, Ciber's counsel responded, informing ACE that "June 27th or 28th is way too late for the mediation.  That would be about five months from the time Ciber exercised its option for mediation under the policy, and such a delay significantly hurts Ciber in its efforts to resolve the underlying matter and have certainty as to the protection it purchased from its insurance carrier.  Please provide available dates in May at the latest."

85.     Through the filing of this Amended Complaint, ACE never has provided a short list of candidates or its position on Mr. Dauer.

86.     On April 28, 2016, Ciber provided a formal response to ACE's denial letter, despite Ciber's counsel previously informing ACE that the denial letter did not raise any issues not already addressed in Ciber's tender letter.

87.     In its April 28, 2016 letter, Ciber concluded by informing ACE that, by May 2, 2016, it "must provide dates for a mediation in May, which Ciber has been demanding since February 3, 2016."

88.     By its intentional delay and failure to act in good faith in proceeding with mediation, ACE has waived or otherwise relinquished its right to require mediation under the Policy.

89.     By its intentional delay and failure to act in good faith in proceeding with mediation, ACE has breached the Policy's alternative dispute resolution provisions.

90.     Further, Ciber received a settlement offer from CamSoft that was significantly more than the $75,000 jurisdictional limit, but under the Policy limits of $20 million.  That settlement offer was time sensitive and was immediately forwarded to ACE.  ACE declined to act in good faith, refused to consider the settlement offer, and failed to take any action to settle the CamSoft Action within Policy limits.

91.     Ciber has already incurred over $1 million in attorneys' fees and costs defending the CamSoft Action.  Thus, Ciber has already spent $500,000 over the retention limit, and those fees and costs should have been paid by ACE.

92.     Further, following the remand, the CamSoft Action is in the early stages of litigation at the start of discovery.  The attorneys' fees and expenses will continue to increase adding to the damages incurred as a result of ACE's failure to defend.

93.     In addition to the cost of the defense, ACE must also provide indemnity to Ciber for the damages that are asserted by CamSoft which, according to the Master Petition, includes "hundreds of millions, if not billions of dollars, in future government and private security sales" related to the security system, "over $4 million in replica system sales," "over $40 million in technology contract work," and "over $900,000 in Crime Camera System sales."

94.     While the Policy provides to Ciber $20 million in coverage, ACE's failure to

provide a defense or indemnity and its existing and continuing bad faith have exposed it to damages in this case that exceed the $20 million dollar limit.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment)

95.     Ciber incorporates by reference each and every allegation contained in paragraphs 1 through 87 of this Amended Complaint.

96.     As set forth above, the Policy provides coverage for the CamSoft Action, and requires ACE to provide Ciber with a defense.

97.     ACE's refusal to defend, in breach of the Policy, has consequences under applicable law and precludes ACE from relying on other policy provisions.

98.     ACE's refusal to defend precludes it from denying coverage for Ciber's potential liability in the CamSoft Action.

99.     This controversy between Ciber and ACE relates to the Policy and is present, substantial, justiciable, and sufficiently invokes this Court's powers to declare the parties' rights and liabilities.

100.    The actual controversy between the parties warranting declaratory judgment includes, but is not limited to, the Policy's coverage for the CamSoft Action, ACE's breach of the duty to defend, and the consequences of ACE's failure to defend.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract)

101.    Ciber incorporates by reference each and every allegation contained in paragraphs 1 through 93 of this Amended Complaint.

102.    The Policy is a valid contract between Ciber and ACE.

16

103.    The Policy required ACE to provide Ciber a defense in the CamSoft Action after Ciber had exhausted the $500,000 retention.

104.    Although Ciber exhausted the $500,000 retention and has now paid over $1 million in attorneys' fees and costs, ACE refuses to provide Ciber a defense in the CamSoft Action.

105.    ACE has also breached the alternative dispute resolution provisions of the Policy by refusing to agree to a mediator, refusing to provide mediation dates, and otherwise refusing to proceed with mediation.

106.    ACE's breach caused Ciber to be damaged.

107.    Ciber has been damaged by ACE's breach, including, but not limited to, defense costs incurred above the Policy's retention which already total $500,000 and continue to increase as the CamSoft Action continues.

108.    Ciber also faces indemnity exposure related to CamSoft's damage claims in the CamSoft Action which, according to the Master Petition, includes "hundreds of millions, if not billions of dollars, in future government and private security sales" related to the security system, "over $4 million in replica system sales," "over $40 million in technology contract work," and "over $900,000 in Crime Camera System sales."

### THIRD CLAIM FOR RELIEF
### (Breach of the Duty of Good Faith and Fair Dealing)

109.    Ciber incorporates by reference each and every allegation contained in paragraphs 1 through 100 of this Amended Complaint.

110.    ACE has a duty of good faith and fair dealing under the Policy.

111.    ACE has breached its duty of good faith and fair dealing as set forth in paragraphs

40 through 94.

112.    ACE's conduct was unreasonable, and ACE knew or should have known that its conduct was unreasonable or it has deliberately disregarded the fact that its conduct was unreasonable.

113.    ACE failed to give equal consideration to its policyholder's interests in determining coverage under the Policy.

114.    ACE did not have a reasonable basis for denying coverage under the Policy.

115.    ACE did not have a valid basis for refusing to provide Ciber with a defense under the Policy.

116.    ACE compelled Ciber to file this lawsuit to recover the benefits to which it is entitled under the Policy.

117.    ACE failed to respond in good faith to a time sensitive settlement offer and failed to protect its policyholder by settling the CamSoft Action within Policy limits.

118.    ACE's bad faith caused Ciber to be damaged.

119.    Ciber has been damaged by ACE's bad faith.

**FOURTH CLAIM FOR RELIEF**
**(Unreasonable Delay or Denial of Benefits)**

120.    Ciber incorporates by reference each and every allegation contained in paragraphs 1 through 110 of this Amended Complaint.

121.    Pursuant to C.R.S. § 10-3-1115(1)(b)(I), Ciber is a first-party claimant seeking an entitlement to benefits owed under the Policy.

122.    ACE is an entity engaged in the business of insurance.

123.    Pursuant to C.R.S. § 10-3-1115(1)(a), ACE shall not unreasonably delay or deny

18

payment of a claim for benefits owed to or on behalf of any first-party claimant.

124.    By refusing to defend and indemnify Ciber for the claim it brought related to the CamSoft Action, ACE has breached its duty not to unreasonably delay or deny payment for Ciber's first-party claim.

125.    As a result of ACE's unreasonable delay, actions, and inactions, Ciber has suffered damages and pursuant to C.R.S. § 10-3-1116(1) and is entitled to recover two times the amount of its covered benefits plus the attorneys' fees and costs it incurs in this litigation.

## PRAYER FOR RELIEF

Wherefore, Ciber respectfully requests judgment as follows:

A.    A judicial declaration that (1) the Policy provides coverage for the CamSoft Action, (2) ACE has a duty to reimburse Ciber for defense costs and fees incurred in defending the CamSoft Action, (3) ACE's conduct as described herein breached its duty of good faith and fair dealing under the Policy, (4) ACE's conduct as described herein constituted a breach of contract, and (5) ACE's refusal to defend precludes ACE from denying coverage under the Policy;

B.    An award against ACE of actual and compensatory damages, in the amount established by the evidence;

C.    An award against ACE of two times the amount of its covered benefits provided by the Policy, costs, and attorneys' fees pursuant to C.R.S. § 10-3-1116(1);

D.    For any and all pre-judgment, post-judgment, and moratory interest at the rate applicable under the law; and

E.    For such other and further relief as this Court deems just and proper.

53302520.3

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury on all issues so triable.

DATED this 6th day of June, 2016

Respectfully submitted,

*S/ Stacy Carpenter*
Stacy A. Carpenter
Polsinelli, P.C.
1515 Wynkoop St., Ste. 600
Denver, Colorado 80202
Telephone:  303-572-9300
Facsimile:  720-228-2287
scarpenter@polsinelli.com

*Attorneys for Plaintiff Ciber, Inc.*

53302520.3